UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SUZANNE VALARIE, as Personal Representative
for the Estate of ANTHONY MCMANUS
Deceased,

       Plaintiff,

v.                                                                                      Case No. 2:07-cv-5
                                                                                        HON. R. ALLAN EDGAR

MICHIGAN DEPARTMENT OF
CORRECTIONS, et al.,

       Defendants.

_____/

## MEMORANDUM

Plaintiff Suzanne Valarie brings this action on behalf of Anthony McManus alleging

constitutional violations pursuant to 42 U.S.C. § 1983 ("Section 1983") and gross negligence

under Michigan law against forty-two separate defendants, including the Michigan Department

of Corrections ("MDOC") and an assortment of individuals, including guards, nurses, medical

staff, and other prison officials (collectively "Defendants").  The action stems from alleged

conduct of Defendants that led to the death of prison inmate, Anthony McManus.

Defendants Nancy Hulkoff, R.N. and Diane Johnson, R.N. move this court for summary

judgment dismissal of the claims against them pursuant to Federal Rule of Civil Procedure 56.

[Court Doc. Nos. 447, 506].  Defendant Fernando Frontera, M.D. also moves for summary

judgment dismissal and for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) for

failure to state a claim upon which relief can be granted.  [Court Doc. No. 503].  Plaintiff

opposes Defendants' motions.  [Court Doc. No. 511, 512, 513, 514].  Defendants Hulkoff and

Johnson request oral argument on their motions. [Court Doc. Nos. 447, 506].  The court

concludes that oral argument is not necessary to the disposition of their motions. Therefore, their request for oral argument will be **DENIED**. The court has reviewed the arguments of the parties, the applicable record, and the pertinent law and has determined that Defendant Hulkoff's motion will be **DENIED**. Defendant Johnson's motion will also be **DENIED**. Defendant Frontera's motion will be **GRANTED**.

## I.    Background

This case arises from the unfortunate events surrounding Anthony McManus' death at the Baraga Correctional Facility on September 8, 2005. Plaintiff's Second Amended Complaint alleges that Anthony McManus was incarcerated at the Baraga Correctional Facility in Baraga, Michigan during the relevant time period until his death in September of 2005. [Court Doc. No. 447-3, Second Amended Complaint]. Plaintiff alleges that Mr. McManus suffered from a number of psychological problems that Defendants failed to treat in the Baraga Correctional Facility. The record demonstrates that the Baraga Correctional Facility did not have a psychiatry department. *See* [Court Doc. No. 447-4, Deposition of Nancy A. Hulkoff, R.N. ("Hulkoff Dep."), p. 21]; [Court Doc. No. 507-5, Deposition of Diane S. Johnson, R.N., ("Johnson Dep."), p. 40, 43]. As Ms. Hulkoff phrased it in her deposition, inmates with psychiatric illnesses "shouldn't be there" and should be transferred to another facility. *Id.* at pp. 21-22, 72. Defendant Johnson called the Baraga facility one that was "off the grid to dispense psychotropic medicine for psychotropic purposes." Johnson Dep., p. 40.

The Second Amended Complaint asserts that on January 21, 2005, Defendant Paul Wiese, a state-employed psychologist evaluated Mr. McManus and removed him from observation status and all restrictions. Second Amended Complaint, ¶ 26. The record reveals

that sometime in the fall of 2004, Mr. McManus was considered to be a suicide risk. *See* Hulkoff Dep., pp. 55, 57.

In late January, one of the nurse Defendants, Kathleen Hornick, ordered that Mr. McManus be placed on a finger food diet and requested a mental health evaluation for him. Second Amended Complaint, ¶ 27. On April 4, 2005 Mr. McManus weighed 140 pounds according to records provided by MDOC. *Id.* at ¶ 29. Plaintiff alleges that by July 1, 2005 Mr. McManus weighed only 90 pounds. The Second Amended Complaint asserts that "[o]n July 7, 2005, Frontera noted that McManus refused to be seen by the medical staff. Frontera didn't take any steps to observe McManus or take any follow up action as a result of the significant weight loss." Second Amended Complaint, ¶¶ 33-34.

The record reveals that Defendant Nurse Clara Chosa examined Mr. McManus on August 24, 2005 for a complaint of ear pain. *See* Second Amended Complaint, ¶ 36; [Ct. Doc. No. 503-4, p. 8]. She noted that Mr. McManus weighed 90 pounds with a height of 5 feet 7 inches. Second Amended Complaint, ¶ 37; [Ct. Doc. No. 503-4, p. 8]. Nurse Chosa noted a referral to a physician for the next day; however, no other health professional examined Mr. McManus between August 24, 2005 and his death on September 8, 2005.

The record reveals that on that same day, August 24th, Nurse Chosa had a conversation with Defendant Gloria Hill in the presence of Defendant Betty Kotila and Defendant Hulkoff in which she discussed Mr. McManus' condition. *See* [Court Doc. No. 447-5, Deposition of Clara Chosa, R.N. ("Chosa Dep."), p. 53]. During this conversation, Nurse Chosa stated that Mr. McManus looked like a "Jew in a concentration camp." *Id.* Defendant Hulkoff remembers overhearing this conversation, and she recalls Defendant Chosa making the statement regarding

Mr. McManus. Hulkoff Dep., pp. 74, 90-91, 150-51. Defendant Hulkoff understood that Mr. McManus weighed 90 pounds and that Nurse Chosa was "very, very concerned about that." Hulkoff Dep., p. 90. Nurse Chosa attempted to schedule an "urgent emergent" appointment for Mr. McManus so that he could be examined by a physician the following day; however, the need for the follow-up appointment was not recorded in the system as an urgent appointment, and Mr. McManus was not examined by a physician the following day. Chosa Dep., p. 53; [Court Doc. No. 503-4, p. 8]. Ms. Hulkoff had "great confidence" in Nurse Chosa and assumed that she would make sure a physician examined Mr. McManus. Hulkoff Dep., pp. 92, 111. Defendant Johnson also admits that she heard rumors that Mr. McManus was "awfully skinny" during the summer of 2005. Johnson Dep., pp. 44-45.

Plaintiff's Second Amended Complaint, as well as the record indicates that Defendants Hulkoff and Johnson observed Mr. McManus while on rounds during September of 2005 in the days immediately preceding his death. Second Amended Complaint, ¶ 41; Hulkoff Dep., pp. 23-24, 56; Johnson Dep., pp. 53-54, 65, 70-72. Nurses Hulkoff and Johnson both agreed that during rounds, they were not obligated to do much more than look "for a breathing body in" the cell. Hulkoff Dep., pp. 38, 71; Johnson Dep. pp. 57-58. Defendant Hulkoff has no specific recollection of seeing Mr. McManus the weekend before he died, although the record demonstrates that she conducted rounds in his unit on the few days preceding his death. *Id.* at p. 56.

Although Defendant Hulkoff overheard the conversation between Nurse Chosa and Gloria Hill regarding Mr. McManus' weight, she believed that he had been seen by Dr. Frontera for the weight issue and operated under that assumption. Hulkoff Dep., p. 73. Therefore,

Defendant Hulkoff did not examine Mr. McManus at any time, nor did she make any special effort to observe him physically during her rounds on September 3rd and 4th. *Id.* She asserted in her deposition:

> Mr. McManus is one of my many, many, many patients, my 800-plus patients. My job on my rounds, and part of my reliance upon the officers, is when I go into that unit that day, I relied – I mean, I cannot see all these 800-plus people.
>
> You know, the state has assigned me this job. I mean, I go in there and they tell me, Okay, he's doing bad today, or somebody's – you know, they're complaining of pain or somebody's laying on the floor, someone's having a seizure, someone's not eating; I will see those people.
>
> There's no way that because I overheard Ms. Chosa say this, that he becomes my patient all of a sudden. I mean, yet, all those people are my patients, but – you know, I have to work. . . . I looked in [Mr. McManus'] cell and did not see a person in distress. . . . I did not see his face, apparently not. . . . I can't recall what I saw, but I saw a living person.

Hulkoff Dep. pp. 73-75.

The record indicates that the nurses performing rounds, including Defendants Hulkoff and Johnson, felt overwhelmed by the number of prisoners for which they were responsible, as well as the number of job-related activities they were expected to perform. *See* Hulkoff Dep., pp. 41-44; Johnson Dep., pp. 59-64. As Defendant Hulkoff stated in her deposition, "But when they have rounds that are – you know, they allow you two seconds to look in a cell on a weekend shift when you have the fifty million other things to do and deal with all your other duties, I'm trying to do the best I can under the circumstances." Hulkoff Dep., p. 69. Defendant Johnson admitted that she "didn't look in the cells very closely" and did not stop at each door when making rounds. Johnson Dep., p. 58. She further admitted that it would have been possible for her to conduct rounds and not notice that an inmate was dead in his cell. *Id.* at pp. 59-60. She further rarely read the details on the forms that outlined care issues pertaining to each prisoner. *Id.* at pp. 62-

64.

The Second Amended Complaint asserts that during the final weeks of Mr. McManus' life various Defendants turned off the water in his cell and restricted his access to food in order to control his behavior. *Id.* at ¶¶ 42-46. The record reveals that although Mr. McManus continued to receive food, he often refused to eat it and used it in unconventional ways, such as smearing it all over his cell or rolling it into little balls to keep in his pocket. *See e.g.*, [Court Doc. No. 514-3, Report to MDOC from James E. Dillon, M.D. ("Dillon Report")].

On September 5, 2005 Mr. McManus flooded his cell. To remove him from the cell, various Defendants sought authorization to use a chemical agent on Mr. McManus. *See* Johnson Dep., p.46. The record reveals that Defendant Johnson researched whether there were any risk factors associated with the use of a chemical agent on Mr. McManus, although she was not aware of what chemical agent was used. She determined that there were no health reasons why a chemical agent could not be used on Mr. McManus. *Id.* at pp. 46-48. She assumed the chemical agent used was "pepper gas." *Id.* Nurse Johnson watched as various prison officers sprayed Mr. McManus with the chemical agent, handcuffed him while he was naked and removed him from his cell, and moved him to a cell in another housing unit. Johnson Dep., p. 65. She "saw that he was naked." *Id.* She "got a glimpse of him just before they covered him up" from a distance of about ten feet. *Id.* at p. 66. She noticed that he was "very thin" and appeared "undernourished," but she focused on his appearance above the shoulders. *Id.* At that point in time, his weight would have been near the 75 pounds that he weighed on September 8, 2005 at the time of his death. Following the application of the chemical agent, Defendant Johnson observed Mr. McManus for signs of distress. Although she could tell from his medical file that he had

probably not seen a doctor since he was referred to one on August 24, she indicated that she was not concerned with his weight, but was "there to check for his breathing." *Id.* at p. 71. She did not touch Mr. McManus to examine him on that day and noted only that he "was verbalizing his usual nonsensical speech." *Id.* at p. 72. At that time she "already knew he had a psychiatric illness." *Id.* at p. 73.

Although Defendant Johnson issued health evaluation notes following the chemical application that indicated that Mr. McManus was in "[n]o apparent distress," [Court Doc. No. 507-6], the video tape of the chemical application incident contradicts her assessment. *See* [Court Doc. No. 514-11, Videotape]. The video footage of the application of the chemical spray demonstrates a very emaciated, naked individual who appears to be in great discomfort, who is verbalizing in an incoherent manner, and who eventually makes repeated clear requests for water and help. *Id.* Mr. McManus' skeletal structure is clearly seen protruding from the skin. During the taped footage, no one provides Mr. McManus with any water. *Id.* Following the application of the chemical spray, Defendant Johnson performed a 24-hour post-application cursory check of Mr. McManus, which did not involve touching him. [Court Doc. No. 514-12]. On her notes regarding this examination, she noted that the "[i]nmate [was] up and talking at cell door. No apparent distress." *Id.*

In the next few days, Defendants Hulkoff and Johnson both were tasked with observing Mr. McManus during their rounds. Although Defendant Hulkoff does not recall specifically observing Mr. McManus during that time, she asserts that if she had seen him the way he looked at the time of his death, she would have examined him and looked at his vital signs, including weight. Hulkoff Dep., pp. 57-58. However, she testified in her deposition that Mr. McManus'

behavior made it difficult for her to observe him in his cell:

> Mr. McManus's habits, most of my contacts with him was that he oftentimes crouched near the door; that was his most common posture in the cell. If you're familiar with the door of a prison, cell door of a prisoner's cell door, is they have that narrow window and then they have the food slots.
> But his most often position when I saw him in his cell is he would crouch near the door. So you would have to peer over into – you know, you can't hardly see a person that's crouched in that corner next to the door, and he would often be in that position. He most often crouched a lot in his cell.

Hulkoff Dep., p. 60. She further noted:

> So I would just, you know, walk by, looking in a cell, just looking for, you know – and if he's crouched next to the door – you know, I mean, a living person can crouch. You have to be living to crouch. So if I would have seen him crouching there, I have to assume he's living; so I would have walked by.

*Id.* at p. 62.

On September 7, 2005 Defendant Officer Latendresse contacted the Prison Health Services Department to request that someone take a look at Mr. McManus because he appeared to be very ill and depressed. No health care professional came that evening to check on Mr. McManus. Defendant Carlson checked Mr. McManus at 6:42 a.m. on September 8, 2005, but did not notice whether Mr. McManus was alive as he appeared to be sleeping on the floor near his bed. At 7:24 a.m. Defendant Pellow checked on Mr. McManus and observed that he was not moving or breathing. Second Amended Complaint, ¶¶ 62-71. MDOC officials then confirmed that Mr. McManus had died. Nurse Hulkoff was on duty the day Mr. McManus died. Hulkoff Dep., p. 64. She observed him following his death and agreed that he appeared to be "extremely undernourished." *Id.* at p. 68. Defendant Hulkoff noted that "[i]f I would have seen him [sic], I would have done something. I would have called Dwayne Waters and I would have sent him to the ER." Hulkoff Dep., p. 117. The autopsy report pertaining to Mr. McManus determined that

the cause of death was "[m]ost likely related to myocarditis complicated by emaciation." [Court Doc. No. 503-11, Autopsy Report].

Mr. McManus' history of psychiatric and psychological problems is well-documented in the record. *See e.g.* [Court Doc. Nos. 514-3, 514-24, 514-25, 514-26]. The report drafted by James Dillon, M.D. reviews Mr. McManus' history of referrals for psychiatric treatment and various diagnoses, such as schizophrenia and bipolar disorder. [Court Doc. No. 514-3, Dillon Report]. With respect to Mr. McManus' habits, the record appears to be clear that he exhibited strange behaviors. *See e.g.,* [Court Doc. No. 507-2, Memorandum from RUO Recker to Inspector Ezrow ("Recker Memo"); Court Doc. No. 503-4, MDOC Health Notes relating to Mr. McManus]. For example, Mr. McManus' health records indicate that on July 1, 2005, his "[a]ffect appears very odd per his usual-grimacing, yelling, with short periods of coherant [sic] talk. Has not been swallowing his food, just chews it up, spits it out and covers his body with it per Cos. Also seen eating nonfood items." [Court Doc. No. 503-4, p. 15]; *see also* [Court Doc. No. 514-6]. On January 31, 2005 when the MDOC psychologist examined Mr. McManus, he indicated that Mr. McManus had a diagnosis of "Mental Disorder NOS Due to Severe Drug Abuse" and "Personality Disorder NOS." *Id.* at p. 23. He also documented Mr. McManus' "strange behavior," which included "talking about the devil, flooding cell." *Id.* A report by a physician who was the Chief of Clinical Affairs for the Corrections Mental Health Program, Dr. James Dillon, reviewed Mr. McManus' history of behavior and concluded that:

> [u]ntreated mental illness probably explains the weight loss that made McManus vulnerable to changes in hydration. Absent behavior arising from mental illness, it is likely that water restriction would not have been imposed. Failure by staff to appreciate the significance of extreme weight loss, whether attributed to mental illness or not, and imposition of water restriction in a nutritionally compromised

prisoner without adequate monitoring appear to be the most immediate preventable contributors to death.

[Court Doc. No. 514-3, Dillon Report].

Defendant Hulkoff noted that Mr. McManus "babbled," and that "it was very difficult to engage him in normal circumstances." Hulkoff Dep., p. 156. Defendant Johnson called his behavior "bizarre." Johnson Dep., p. 38. Johnson had a history of working with psychiatric patients, and she believed Mr. McManus had a psychiatric illness while he was housed in Baraga. Johnson Dep., p. 42. When asked about Mr. McManus' strange verbalizations following application of the chemical agent, Ms. Johnson admitted, "I think that I already knew he had a psychiatric illness." Johnson Dep., p. 73. When she checked on him twenty-four hours after application of the chemical agent, she found him verbalizing "nonsensical babble" and noted that she "would have been surprised" if he had "verbalized a logical statement." *Id.* at p. 90. During her deposition, Ms. Johnson and plaintiff's attorney engaged in the following exchange regarding her 24-hour post-chemical agent check:

> Q:    Do you recall looking at his body to see if it appeared to be in good health or severely malnourished, or looking at it for any reason?
> A:    No, I was there for twenty-four-hour postchemical agent check.
> Q:    Does that mean you focused on his what, face, and realized he was breathing normally, and heard him babbling so you went on?
> A:    Yes, he was presenting as he normally would to me.

Johnson Dep., p. 91. Ms. Johnson does not recall whether she discussed why Mr. McManus was housed at Baraga with her nursing supervisors. *Id.* at pp. 136-37.

In addition, although Defendant Hulkoff admitted that she thought "Mr. McManus needed a great deal of help" and that he "probably did not fit being in that kind of a facility," she did not try to refer him for psychological treatment at any time. Hulkoff Dep., pp. 139-140; 158.

-10-

As a registered nurse, Defendant Hulkoff has been trained to recognize basic psychiatric illnesses. *Id.* at p. 140. Nurse Hulkoff never requested any kind of help or health care assistance for Mr. McManus prior to his death. *Id.* at p. 158. Nor did Ms. Hulkoff ever review Mr. McManus' medical records to determine if he had ever been examined by Dr. Frontera, despite her concern for his well-being after overhearing Nurse Chosa's comments. *Id.* at pp. 158-59.

With respect to Dr. Frontera, he testified in his deposition that he has "no memory of ever seeing Mr. McManus before he died." [Court Doc. No. 503-5, Deposition of Fernando Frontera, M.D. ("Frontera Dep."), pp. 26-27]. He also asserted that he had no responsibility to review the MDOC nurses' work product. *Id.* at p. 28. Dr. Frontera only authored one electronic record pertaining to Mr. McManus prior to his death. That record was dated July 7, 2005. *Id.* at p. 33. Dr. Frontera only noted that Mr. McManus refused to be evaluated by him on July 7th. *Id.* at p. 42. He asserts that no one ever contacted him about Mr. McManus' condition prior to his death. *Id.* at p. 41. Nor does he remember hearing anyone ever talk about Mr. McManus' severe weight loss before his death or recall hearing rumors about any prisoner who looked like a "Jew in a concentration camp." *Id.* at p. 60. However, the record indicates that Defendant Hornick referred Mr. McManus to be seen by Dr. Frontera on July 1, 2005 because Mr. McManus was "very thin and ill looking" with a weight of 90 pounds. [Court Doc. No. 514-6, p. 2]. It is unclear from the record whether Dr. Frontera reviewed Nurse Hornick's referral notes. Dr. Frontera did not attempt to evaluate Mr. McManus further even though Mr. McManus "refused" to be seen. [Court Doc. No. 514-7]. In addition, the records demonstrate that Dr. Frontera was present for rounds on Mr. McManus' unit on September 5, 2005. [Court Doc. No. 514-13]. However, he did not examine or recall seeing Mr. McManus at that time. The first time Dr.

Frontera examined Mr. McManus was upon his death on September 8, 2005. *See* [Court Doc. No. 514-14].

Following Mr. McManus' death, MDOC conducted an investigation into the circumstances surrounding his death. *See* [Court Doc. No. 503-8, Memoranda dated January 10, 2006 ("Investigation Memos")]. The Investigation Memos outlined various MDOC prisoner health care policies. One policy, Health Care in Segregation Units, stated in part:

> a.　　Nurses assure medical and psychiatric needs of those offender/patients housed in segregation are being met. They administer medications, perform psychiatric and physical assessments, provide emergency care, crisis intervention, treatments, health education, referrals, and observe the unit and offender/patients for any adverse conditions.
> b.　　Offenders whose movement is restricted in segregation may develop signs of acute anxiety or other mental health problems. Any offender/patient remaining in segregation for more than 30 consecutive days shall receive a personal interview and behavioral assessment by a psychologist or social worker. Subsequently, they will be evaluated every 90 days, or more frequently, if prescribed by a medical/psychological/or psychiatric authority.
> c.　　Health care staff shall provide full range of psychiatric, medical, and psychological evaluation, referral, and treatment to offenders/patients placed in segregation/detention units.
> d.　　The Warden and Regional Health Administrator shall be immediately informed in writing by the attending health professional of any condition observed in the segregation unit which may present a serious threat to an offender/patient's mental or physical health.

Investigation Memos, p. 24.

Both Defendants Hulkoff and Johnson were disciplined as part of the investigation process. MDOC found that Defendant Hulkoff had violated three work rules: inhumane treatment, conduct unbecoming to an employee, and dereliction of duties. Hulkoff Dep., p. 125; [Court Doc. No. 503-8]. It determined that Defendant Johnson had also violated several work rules. [Court Doc. No. 514-43, Investigation Report Regarding Diane Johnson]. Defendant

Hulkoff received a 5-day suspension.  Hulkoff Dep., p. 123-132.  Defendant Johnson was asked

not to return to work and officially resigned.  Johnson Dep., p. 18.

With respect to Defendant Hulkoff, the Investigation Memos concluded:

My findings indicate the following work rules may have been violated.
#1 "Inhumane Treatment of Employee"
#5 "Conduct Unbecoming a Department Employee"
#27 "Dereliction of Duty"
The nurses are to assure medical and psychiatric needs of those offender/patients
housed in segregation are being met.  They are to observe each prisoner when
completing segregation rounds.
Nancy Hulcoff [sic] stated in her questionnaire that she had heard RN Clara Chosa
state on August 24, 2005 something to the effect of Anthony McManus looking
like, "a Jew that had been in a concentration camp".  In the same questionnaire
she states that she did not follow-up on McManus because he was scheduled with
the MSP the next day.  Approximately two weeks later, Nancy Hulkoff completed
segregation rounds on both, September 3rd & 4th.  During segregation rounds
Nancy Hulkoff neglected to recognize the deteriorating condition of Anthony
McManus and provided neither a nursing assessment, nor referral to the
appropriate qualified health care provider.
Nancy Hulkoff neglected to perform her job duties of September 3rd and
September 4th, 2005 by failing to:
a) Recognize the critical need of emergent health care interventions for McManus'
self inflicted emaciation and the need for mental health stabilization.

Investigation Memos, pp. 4-5.  The record indicates that MDOC sustained the three work rule

violations of inhumane treatment, dereliction of duty, and conduct unbecoming a department

employee.  [Court Doc. No. 503-8, p. 21].

With respect to Defendant Johnson, the investigator responsible for drafting the

Investigation Memos, Leslie Wight, determined that:

Diane Johnson is a Registered Nurse.  It is her responsibility as a nurse assigned
to make segregation rounds to identify prisoners who are in need of emergent
health care interventions.  It is also her responsibility as the nurse present during
the use of chemical agents to examine prisoners post chemical agent use and
assure their health needs are evaluated and met.  She did not document any
evaluation or identification of need of health care interventions after observing the

-13-

use of chemical agents.

Video tape of Diane Johnson rounds on September 6, 2005 indicates that she did open the door window cover to the cell of Anthony McManus to observe him. She also documented segregation rounds on CAJ-278 for Anthony McManus on September 6, 2005. However, she failed to identify a serious medical condition on an adult patient who weighed approximately 75 pounds on September 5, 2005 when she observed the use of chemical agents and again on September 6, 2005 when she made segregation rounds and documented a visit. Review of the taping of the chemical agent use identifies a prisoner who is in serious need of emergency health care.

Investigation Memos, p. 27. The Investigation Memo pertaining to Johnson recommends charging her with seven rule violations, including inhumane treatment of offenders, conduct unbecoming of a MDOC employee, dereliction of duty, and failure to enforce or follow rules, regulations, policies or procedures. *Id.*

One of the Investigation Memos, dated February 14, 2006 drafted by Jeff Baumann, indicates the following conclusion:

> **The death of Anthony McManus could have been prevented** with appropriate medical and psychological intervention. McManus weighed approximately 140 lbs. on 4/4/05 (as determined by his ID photo); weighed approximately 90 lbs. on 7/1/05; and at the time of his death and autopsy weighed approximately 75 lbs. This is a substantial weight loss of approximately 65 lbs. from 4/4/05 to 9/8/05. On 9/5/05, McManus was administered a chemical agent because he was allegedly "disruptive" and needed to be moved to a different cell. The "gassing" of McManus may have contributed to his failing health. Three days after being "gassed" McManus was found dead in his administrative segregation cell.

Investigation Memos, p. 40.

Plaintiff has provided this court with several expert opinion reports regarding the substandard level of care that Mr. McManus received while incarcerated in the MDOC prison system. *See* [Court Doc. Nos. 514-23 through 514-31]. It is not necessary at this stage of the proceedings to detail all of the various opinions of these experts, including prison officials,

physicians, psychiatrists, medical school professors, and nurses.  However, while they all generally agreed that various individuals could have done more to prevent Mr. McManus' unfortunate death, one line from an expert prison official, Ken Katsaris stands out.  [Court Doc. No. 514-23].  In his affidavit he opines that "[a]nimals in animal shelters are generally given more attention and better care than was afforded to McManus."  *Id.*  Another expert report from Michele DeGregorio, M.D., indicates her opinion that Mr. McManus' "whole autopsy showed clear malnutrition and cardiac cachexia. . . . Even by body mass index criteria, the patient was severely malnourished, and there is something clear everybody can see just by looking at him." [Court Doc. No. 514-27, p.3].

Indeed, even the inmate across the hall, an obvious layperson, Bobby Fisher, could tell that Mr. McManus was suffering.  He testified in his deposition that "you could see that his eyes was [sic] turning yellow, his cheeks were sunken in, the skin on his frame was just hanging off his bones like clothes on a hanger."  [Court Doc. No. 514-39, Deposition of Bobby Fisher ("Fisher Dep."), p. 15].  He further commented that "it was tragic the way I seen – what I seen as far as his physical deterioration, the way that the officers had treated him, and in general the whole situation was – it was sad.  It was just, you know, the type of situation that you had nightmares about regardless of – regardless of who you is [sic]."  *Id.* at p. 14.  He further recognized that although Mr. McManus' behavior was undesirable, "[h]e was just not all the way psychologically there. . ."  *Id.* at p. 18.  These problems were obvious to Mr. Fisher, despite his lack of training in psychology.  *Id.* at pp. 18-19.  Although Mr. McManus cried out for help, Mr. Fisher testified that Defendant Hulkoff and Defendant Johnson just walked by Mr. McManus' cell.  *Id.* at pp. 21-22.  Mr. Fisher testified that he spoke to various officers "[a]lmost every day"

about Mr. McManus' condition seeking "[m]edical help, water, psychological help, moving him out the unit, sending him to a different facility. Anything just to try to get him out the situation that he was in because it was so – it was so horrible. The situation was just like a nightmare." *Id.* at p. 35.

After viewing the videotape of Mr. McManus, Defendant Warden Timothy Luoma, one of the MDOC prison employees employed during the relevant time period, testified that it "was obvious" to him that Mr. McManus was in serious need of medical attention at the time the video footage was taped. [Court Doc. No. 514-45, Deposition of Timothy Luoma, pp. 29-30]. Indeed, he agreed that it should have been obvious to anyone that Mr. McManus needed medical attention at that time. *Id.*

MDOC maintained several policies relating to the health care services to which prisoners were entitled. One such policy indicated that "[p]risoners shall be provided with unimpeded access to a continuum of health care services that is timely, humane and cost efficient." [Court Doc. No. 514-32, Policy Directive No. 03.04.100, p. 2]. The policy continued that, "[a] prisoner whose health care needs cannot be met at the facility where the prisoner is housed shall be transferred to a facility where those needs can be met. . . ." *Id.* at p. 3. The policy further states that "[n]ursing staff shall make daily rounds in segregation units to collect written requests for health care services from prisoners and to follow up on health care concerns. Rounds also shall be made at least every two weeks by an MSP." *Id.* at p. 7. An "MSP" is defined as a "Medical Service Provider" and includes physicians licensed by the State of Michigan. *Id.* at p. 2. Dr. Frontera was the MSP for Mr. McManus' unit. Policy Directive No. 04.05.120 provides that "[e]ach segregated prisoner shall be seen at least daily by members of the housing unit team.

Segregation prisoners displaying symptoms of serious mental illness or severe mental disorder shall be promptly assessed in accordance with PD 04.06.182 'Mentally Ill Prisoners in Segregation.'" [Court Doc. No. 514-33, Policy Directive No. 04.05. 120].

## II.      Standard of Review

### A.      Motion for Summary Judgment

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The burden is on the moving party to show conclusively that no genuine issue of material fact exists, and the Court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943 (6th Cir. 1990); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

Once the moving party presents evidence sufficient to support a motion under Fed. R. Civ. P. 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *White*, 909 F.2d at 943-44; *60 Ivy Street*, 822 F.2d at 1435. The moving party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of the nonmoving party's case with respect to which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of the witnesses, and determine the truth of the matter. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *60 Ivy Street*, 822 F.2d at 1435-36. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 140 (6th Cir. 1997). If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *University of Cincinnati v. Arkwright Mut. Ins. Co.*, 51 F.3d 1277, 1280 (6th Cir. 1995); *LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).

**B.      Motion to Dismiss for Failure to State a Claim**

Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). In reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court "must read all well-pleaded allegations of the complaint as true." *Weiner v. Klais and Co., Inc.*, 108 F.3d 86, 88 (6th Cir. 1997) (citing *Bower v. Federal Express Corp.*, 96 F.3d 200, 203 (6th Cir. 1996)). In addition, a court must construe all allegations in the light most favorable to the plaintiff. *Bower*, 96 F.3d at 203 (citing *Sinay v. Lamson & Sessions*, 948 F.2d 1037, 1039 (6th Cir. 1991)).

The Supreme Court has recently explained "an accepted pleading standard" that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with

the allegations in the complaint."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1969 (2007).  The complaint "must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory."  *Weiner*, 108 F.3d at 88 (citing *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993)).  In *Twombly* the Supreme Court emphasized that:

> [w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, . . . Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

127 S.Ct. at 1964-65 (citations omitted).  *See also, Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932 (1986) (noting that "[a]lthough for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation").

Dr. Frontera moves for dismissal of the gross negligence claim against him pursuant to Fed. R. of Civ. P. 12(b)(6).  [Court Doc. No. 503].  However, he relies upon documents outside of the pleadings in support of the motion.  As the Sixth Circuit has noted:

> [w]hen a court considers matters outside the pleadings in a Rule 12(b)(6) motion, Rule 12(d) requires that "the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d).  A district court may convert the motion *sua sponte*.  This conversion, however, "should be exercised with great caution and attention to the parties' procedural rights."
>
> In the Sixth Circuit, before a district court may convert the motion *sua sponte*, the "district court must afford the party against whom *sua sponte* summary judgment is to be entered ten-days notice and an adequate opportunity to respond."  Despite this "clearly established rule," an appeals court will reverse for failure to notify only if the losing party can "demonstrate prejudice."
>
> *Yashon* states that the notice requirement is flexible and that a failure to

give notice will result in reversal only if there was sufficient prejudice to the non-
moving party.

*Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 487-88 (6th Cir. 2009) (quoting *Yashon v.
Gregory*, 737 F.2d 547, 552 (6th Cir. 1984) and citing 5C Wright & Miller § 1366) (other
citations omitted).

Because Dr. Frontera has relied on numerous documents beyond the pleadings and
because the Plaintiff has opposed Dr. Frontera's motion with numerous documents beyond the
pleadings, the court finds that is it appropriate to consider Dr. Frontera's motion to dismiss as a
motion for summary judgment pursuant to Fed. R. Civ. P. 56. The court concludes that Plaintiff
will not suffer prejudice as a result of this conversion because Plaintiff has had an opportunity to
file over 500 pages of material into the record in support of her opposition to the motion filed by
Dr. Frontera, as well as the motions filed by Defendants Hulkoff and Johnson.

### III.    Analysis

### A.    Section 1983

Section 1983 states in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983. To establish a claim pursuant to Section 1983, a plaintiff must demonstrate
two elements: "(1) the defendants deprived [plaintiff] of a right, privilege, or immunity secured
to [him] by the United States Constitution or other federal law; and (2) the defendants caused the
deprivation while acting under color of state law." *Cunningham v. Sisk*, 2003 WL 23471541, *5

(E.D. Tenn. 2003) (citing *Gregory v. Shelby County, Tenn.*, 220 F.3d 433, 441 (6th Cir. 2000),

*abrogated on other grounds as stated in DiLaura v. Township of Ann Arbor*, 471 F.3d 666, 671

n.2 (6th Cir. 2006)).  Section 1983 " 'creates no substantive rights; it merely provides remedies

for deprivations of rights established elsewhere.' " *Alexander v. Haymon*, 254 F.Supp.2d 820,

830 (S.D. Ohio 2003) (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 310 (6th Cir. 2000)).

Defendants claim that their actions are protected by the doctrine of qualified immunity.

The doctrine of qualified immunity "shields 'government officials performing discretionary

functions  . . . from civil damages liability as long as their actions could reasonably have been

thought consistent with the rights they are alleged to have violated.'" *Solomon v. Auburn Hills

Police Dep't*, 389 F.3d 167, 172 (6th Cir. 2004) (quoting *Anderson v. Creighton*, 483 U.S. 635,

638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).  The U.S. Supreme Court has established a two-

part test, the order of which the Court has recently relaxed, for determining whether a state

government employee is entitled to qualified immunity.  *See Lyons v. City of Xenia*, 417 F.3d

565 (6th Cir. 2005) (citing *Brosseau v. Haugen*, 543 U.S. 194, 125 S.Ct. 596, 160 L.Ed.2d 583

(2004)).  Under this test district courts must:

> consider whether 'the facts alleged show the officer's conduct violated a
> constitutional right.' . . . If the plaintiff can establish that a constitutional violation
> occurred, a court should ask 'whether the right was clearly established . . . in light
> of the specific context of the case, not as a broad general proposition.'

*Lyons*, 417 F.3d at 571 (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d

272 (2001)).  The Supreme Court has recently receded from the strict formula described in

*Saucier v. Katz* and determined that the *Saucier* "procedure should not be regarded as an

inflexible requirement."  *See Pearson v. Callahan*, __ U.S. __, 129 S.Ct. 808, 812 (2009).  The

Court explained that:

> [o]n reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.

*Pearson*, 129 S.Ct. at 818.

A right may be defined as clearly established by looking to Supreme Court precedent, then to Sixth Circuit precedent, then to other courts within the Sixth Circuit, and finally to decisions of other circuits. *See Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000).

In addition, "[q]ualified immunity affords government officials an immunity from suit 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Burden v. Carroll*, No. 03-2149, 108 F. App'x. 291, 293, 2004 WL 1826602 (6th Cir. Aug. 12, 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). This analysis should consider the legal rules that are clearly established at the time the defendants took the alleged actions. *See Rodgers v. Jabe*, 43 F.3d 1082, 1085 (6th Cir. 1995) (relying on *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987)). As the Sixth Circuit has clarified, "[f]or a right to be clearly established, 'there need not be a case with the exact same fact pattern, or even 'fundamentally similar' or 'materially similar' facts; rather, the question is whether the defendants had 'fair warning' that their actions were unconstitutional." *Perez v. Oakland County*, 466 F.3d 416, 427 (6th Cir. 2006) (quoting *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005)).

In 2002, the Supreme Court clarified whether to be clearly established, prior case law must have discussed highly factually similar situations. In *Hope v. Pelzer* the Supreme Court addressed whether shackling an inmate to a "hitching post" with his arms at face height for seven hours without a shirt and with no water or bathroom breaks constituted a violation of the prisoner's Eighth Amendment rights that was clearly established. 536 U.S. 730, 122 S.Ct. 2508 (2002). The Court determined:

> As the facts are alleged by [petitioner], the Eighth Amendment violation is obvious. Any safety concerns had long since abated by the time petitioner was handcuffed to the hitching post because [petitioner] had already been subdued, handcuffed, placed in leg irons, and transported back to the prison. He was separated from his work squad and not given the opportunity to return to work. Despite the clear lack of an emergency situation, the respondents knowingly subjected him to a substantial risk of physical harm, to unnecessary pain caused by the handcuffs and the restricted position of confinement for a 7-hour period, to unnecessary exposure to the heat of the sun, to prolonged thirst and taunting, and to a deprivation of bathroom breaks that created a risk of particular discomfort and humiliation. The use of the hitching post under these circumstances violated the "basic concept underlying the Eighth Amendment[, which] is nothing less than the dignity of man." This punitive treatment amounts to gratuitous infliction of "wanton and unnecessary" pain that our precedent clearly prohibits.

*Hope*, 536 U.S. at 738, 122 S.Ct. at 2514-15 (quoting *Trop v. Dulles*, 356 U.S. 86, 100, 78 S.Ct. 590 (1958)). With respect to whether a violation of a constitutional right has been clearly established, the Supreme Court elaborated:

> Our opinion in *Lanier* thus makes clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, in *Lanier*, we expressly rejected a requirement that previous cases be "fundamentally similar." Although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with "materially similar" facts. Accordingly, pursuant to *Lanier*, the salient question that the Court of Appeals ought to have asked is whether the state of the law in 1995 gave respondents fair warning that their alleged treatment of [petitioner] was unconstitutional.

*Hope*, 536 U.S. at 741, 122 S.Ct. at 2516 (citing *United States v. Lanier*, 520 U.S. 259, 117 S.Ct. 1219 (1997)).  The Supreme Court found that tying the petitioner to the "hitching post" for hours violated the Eighth Amendment and determined that the "obvious cruelty inherent in this practice should have provided respondents with some notice that their alleged conduct violated [petitioner's] constitutional protection against cruel and unusual punishment."  *Id.* at 745, 122 S.Ct. at 2518.

Once a defendant claims the affirmative defense of qualified immunity, the burden shifts to the plaintiff to demonstrate that the defendant is not entitled to the defense of qualified immunity.  *Myers v. Potter*, 422 F.3d 347, 352 (6ᵗʰ Cir. 2005) (citing *Gardenhire*, 205 F.3d at 311).

The issue in this case is whether the Defendants violated Anthony McManus' constitutional rights and if so, whether those rights were clearly established at the time that Defendants violated them.  The Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishments."  Const. Amend. IIX.  This Amendment is made applicable to the States by the Fourteenth Amendment to the United States Constitution. *See Estelle v. Gamble*, 429 U.S. 97, 101, 97 S.Ct. 285, 289 (1976).  The United States Supreme Court has interpreted the Eighth Amendment as including an obligation upon the part of the government to "provide medical care for those whom it is punishing by incarceration."  *Id*. at 103, 97 S.Ct. 285.  The Supreme Court explained the purpose behind the obligation to provide medical care pursuant to the Eighth Amendment:

> An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.  In the worst cases, such a failure may actually produce physical 'torture or a lingering death,' the evils of

most immediate concern to the drafters of the Amendment. . . . The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common-law view that '(i)t is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty care for himself.'

We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

This conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment. An accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain. . . . in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Id.* at 104-06, 97 S.Ct. 285 (citations omitted).

In *Farmer v. Brennan*, the Supreme Court helped to define the term of "deliberate indifference" as " a state of mind more blameworthy than negligence." 511 U.S. 825, 835, 114 S.Ct. 1970 (1994). There, the Supreme Court held:

that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837, 114 S.Ct. 1970.  The Supreme Court clarified this subjective intent standard:

> Under the test we adopt today, an Eighth Amendment claimant need not show that
> a prison official acted or failed to act believing that harm actually would befall an
> inmate; it is enough that the official acted or failed to act despite his knowledge of
> a substantial risk of serious harm. . . .  Whether a prison official had the requisite
> knowledge of a substantial risk is a question of fact subject to demonstration in
> the usual ways, including inference from circumstantial evidence, and a factfinder
> may conclude that a prison official knew of a substantial risk from the very fact
> that the risk was obvious.

*Id.* at 842, 114 S.Ct. 1970 (citations omitted).  As the Sixth Circuit has phrased it, "[o]bduracy or

wantonness, not inadvertence or good faith error, characterizes deliberate indifference."  *Gibson*

*v. Foltz*, 963 F.2d 851, 853 (6th Cir. 1992) (citing *Wilson v. Seiter*, 501 U.S. 294, 111 S.Ct. 2321,

2324 (1991)).  In addition, "[t]he long duration of a cruel prison condition may make it easier to

establish knowledge and thus intent on the part of prison officials, but the existence of cruel

prison conditions does not cause the intent requirement to 'evaporate.'"  *Gibson*, 963 F.2d at 853.

The Sixth Circuit has also analyzed a claim of deliberate indifference to medical needs.

In *Comstock v. McCrary* the Court noted that "we have long held that prison officials who have

been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to

such a prisoner."  273 F.3d 693, 702 (6th Cir. 2001).  The Court continued:

> An Eighth Amendment claim has two components, one objective and one
> subjective.  To satisfy the objective component, the plaintiff must allege that the
> medical need at issue is "sufficiently serious."  To satisfy the subjective
> component, the plaintiff must allege facts which, if true, would show that the
> official being sued subjectively perceived facts from which to infer substantial
> risk to the prisoner, that he did in fact draw the inference, and that he then
> disregarded that risk.

*Id.* at 702-03.  *See also, Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004).  In

addition, " '[k]nowledge of the asserted serious needs or of circumstances clearly indicating the

existence of such needs, is essential to a finding of deliberate indifference.'" *Blackmore*, 390

F.3d at 896 (quoting *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6ᵗʰ Cir. 1994)).

The Sixth Circuit has held that

> where a plaintiff's claims arise from an injury or illness "so obvious that even a
> layperson would easily recognize the necessity for a doctor's attention," the
> plaintiff need not present verifying medical evidence to show that, even after
> receiving the delayed necessary treatment, his medical condition worsened or
> deteriorated.  Instead, it is sufficient to show that he actually experienced the need
> for medical treatment, and that the need was not addressed within a reasonable
> time frame.

*Blackmore*, 390 F.3d at 899-900 (quoting *Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d

203, 208 (1ˢᵗ Cir. 1990)).

> Further, the Sixth Circuit has explained:

> a determination of deliberate indifference does not require proof of intent to harm
> or a detailed inquiry into [defendant's] state of mind.  In *Leach v. Shelby County*, .
> . . we found that the 'deplorable' conditions under which inmate Leach was
> incarcerated (he was not bathed or given a hospital mattress for several days, in
> spite of his paraplegic condition) established that his serious medical needs were
> deliberately ignored.

*Weeks v. Chaboudy*, 984 F.2d 185, 187 (6ᵗʰ Cir. 1993) (citing *Leach v. Shelby County*, 891 F.2d

1241 (6ᵗʰ Cir.), *cert. denied*, 495 U.S. 932, 110 S.Ct. 2173, 109 L.Ed.2d 502 (1989)).

With respect to providing inmates with adequate nutrition, "[t]here is no question that an

inmate's Eighth Amendment right to adequate food is clearly established."  *Foster v. Runnels*,

554 F.3d 807, 815 (9ᵗʰ Cir. 2009) (citing *Farmer*, 511 U.S. at 832, 114 S.Ct. 1970; *Keenan v.

Hall*, 83 F.3d 1083, 1091 (9ᵗʰ Cir. 1996), *opinion amended on denial of rehearing by* 135 F.3d

1318 (9ᵗʰ Cir. 1998)); *see also, Cunningham v. Jones*, 567 F.2d 653, 659-60 (6ᵗʰ Cir. 1977)

(discussing unconstitutionality of a "slow starvation diet" and remanding to district court to

determine whether the admitted restriction of prisoner's diet to one meal a day was "sufficient to maintain normal health" and thus not a violation of the Eighth Amendment); *Phelps v. Kapnolas*, 308 F.3d 180, 187 (2d Cir. 2002); *Reed v. McBride*, 178 F.3d 849, 853-56 (7th Cir. 1999); *Simmons v. Cook*, 154 F.3d 805, 807-09 (8th Cir. 1998).

In *Clark-Murphy v. Foreback* the Sixth Circuit addressed a strikingly similar case to the one presented here. 439 F.3d 280 (6th Cir. 2006). In that case the surviving sister of an inmate who died of dehydration while in custody in the Michigan state prison system brought suit against several prison officials pursuant to Section 1983 for violation of her brother's Eighth Amendment rights. The Sixth Circuit addressed whether the district court properly denied qualified immunity to fifteen corrections officers who were on duty "during the isolation, dehydration and eventual death" of the inmate. *Id.* at 282. Michigan prison officials transferred the inmate to an observation cell following his collapse in the late June heat. *Id.* at 283. Although the inmate was acting erratically and "barking," the defendants did not obtain immediate psychological treatment for him. It is also clear that the inmate was refusing meals, throwing his food on the floor, and that the defendants had turned off the water in his cell, despite soaring summer temperatures. On July 4 one of the prison officers found the inmate naked and dead in his cell with his water turned off and his toilet dry. *Id.* at 283-85.

The Sixth Circuit determined that "little room for debate exists about the objective component of [the appellee's] Eighth Amendment claim. In the abstract, the deprivation of water and medical care, including psychological services, of course would be 'sufficiently serious' to satisfy this requirement, and the defendants do not argue otherwise." *Id.* at 286-87. The Court then proceeded to analyze whether the subjective part of the deliberate indifference test was

satisfied. The Court determined that two of the officers were not deliberately indifferent to the inmate's needs because they both "took reasonable steps to ensure that [another defendant] looked out for [the inmate's] safety," including looking into his treatment history, as well as communicating their concerns that the inmate needed psychiatric aid. *Id.* at 287. The court further dismissed claims against two other defendants due to their limited contact with the defendant and the absence of evidence of their purposeful indifference to his health and safety needs. *Id.* at 291. However, the court determined that there was an issue of fact regarding whether eleven other defendants showed deliberate indifference to the inmate's health and safety needs. *Id.* It further found that "[a]t the time of this incident, it should come as no surprise that [the inmate] had a clearly established right not to be deprived of food and water. The same holds true for [the inmate's] right to psychological treatment." *Id.* at 292 (citing *Kent v. Johnson*, 821 F.2d 1220, 1229 (6th Cir. 1987); *Cherrington v. Skeeter*, 344 F.3d 631, 637 (6th Cir. 2003); *Comstock*, 273 F.3d at 702) (other citations omitted).

In this case, as in *Clark-Murphy*, it is clear that the objective component of the deliberate indifference test has been satisfied. Mr. McManus' body weight fell by fifty pounds over the course of four months. He received so little food and water that he finally succumbed to death on September 8, 2005. He clearly had serious psychological issues, yet the Baraga facility did not provide its inmates with psychiatric treatment or medications to treat mental illness. Not a single Defendant made a serious attempt to have Mr. McManus transferred to a facility that could treat his obvious mental illness. Therefore, the court has no trouble in concluding that the objective test for deliberate indifference has been met with respect to Defendants Frontera, Johnson, and Hulkoff.

It is further clear that an inmate's right to both adequate food and water *and* psychological services has been clearly established for some time, at least dating back to 2002, the time period in question for the events occurring in the *Clark-Murphy* decision. *See* 439 F.3d 280; *see also Scicluna v. Wells*, 345 F.3d 441, 447 (6th Cir. 2003) (determining that "[k]nowingly waiting three weeks to examine a prisoner referred to one's care for urgent attention is conduct that a reasonable prison official in 1992 should have known would subject him to personal liability"); *Weeks v. Chaboudy*, 984 F.2d 185, 187 (6th Cir. 1993) (noting that "[m]ental illness is no less real than other illness"). The only remaining question for this court with respect to Plaintiff's Section 1983 claims is whether the evidence satisfies the subjective component of the deliberate indifference test for each of the three Defendants at issue in these motions. The court will address each Defendant in turn.

### 1. Defendant Diane Johnson

A review of the evidence makes it clear that Defendant Johnson had subjective knowledge of Mr. McManus' precarious health condition and chose to ignore the obvious outward signs of his malnutrition and drastic weight loss. Ms. Johnson researched the application of the chemical agent on Mr. McManus, and she watched as prison officials withdrew the naked McManus from his cell and marched him down the hall and outside to another prison unit. At that time, she noticed that Mr. McManus was "very thin" and appeared "undernourished." Johnson Dep., pp. 65-66. She indicated on her health forms that Mr. McManus was in "no apparent distress," although the video footage of the chemical application shows a severely emaciated man in great discomfort clearly calling for help and water. [Court Doc. Nos. 507-6 and 514-11]. Although Defendant Johnson was tasked with checking on Mr.

McManus immediately following the application of the chemical agent and for a 24-hour post application examination, she did not touch Mr. McManus nor take note of any of his vital signs, like weight, blood pressure, or heart rate.

Further, Defendant Johnson has a background in working with the mentally ill. She admits that she knew Mr. McManus had psychological problems, but she never referred him for psychological or psychiatric treatment. She noted that he babbled and was generally non-sensical when he attempted to verbalize anything, and she knew that Baraga could not provide treatment for inmates with psychological problems. Yet, Defendant Johnson did nothing to improve conditions for Mr. McManus or refer him to someone who could assess his psychological needs.

Defendant Johnson was also responsible for making rounds in Mr. McManus' unit in the days immediately preceding his death, and she never attempted to provide or obtain any medical treatment for him. She personally witnessed his condition on September 5, 2005, yet she still took no action to provide any medical or psychological assistance to Mr. McManus. She admitted that she basically checked inmate's cells for breathing bodies and might not have even noticed if an inmate was dead in his cell, despite MDOC's health policies requiring nurses to provide medical assistance to prisoners with clear medical needs. Johnson Dep., pp. 58-60; [Court Doc. Nos. 514-32, 514-33].

Following Mr. McManus' death, MDOC's investigation revealed that Defendant Johnson had violated her obligations as a prison nurse and had violated several work rules. She was asked to resign from her position. Based on the evidence presented, it appears to the court that there is genuine issue of material fact regarding whether Defendant Johnson was deliberately indifferent to Mr. McManus based on her clear subjective knowledge of his precarious condition.

Therefore, Defendant Johnson's motion for summary judgment pertaining to Mr. McManus' Section 1983 claim will be **DENIED**.

### 2.    Defendant Hulkoff

The record also demonstrates that Defendant Hulkoff had subjective knowledge of Mr. McManus' condition and assumed that someone else would provide him with care. Defendant Hulkoff admits that she overheard Nurse Chosa describe Mr. McManus as looking like a "Jew in a concentration camp." She further knew that Nurse Chosa was very concerned about Mr. McManus; however, Defendant Hulkoff assumed that someone else would take care of Mr. McManus' needs and that there was no need for her to investigate further whether Mr. McManus was receiving adequate medical care, nutrition, and hydration.

The Investigation Memos note that:

Nancy Hulkoff completed segregation rounds on both, September 3rd & 4th. During segregation rounds Nancy Hulkoff neglected to recognize the deteriorating condition of Anthony McManus and provided neither a nursing assessment, nor referral to the appropriate qualified health care provider.

Nancy Hulkoff neglected to perform her job duties of September 3rd and September 4th, 2005 by failing to:

a) Recognize the critical need of emergent health care interventions for McManus' self inflicted emaciation and the need for mental health stabilization.

Investigation Memos, pp. 4-5. Despite being responsible for making rounds in Mr. McManus' unit during the last few days of his life, Defendant Hulkoff failed to note his specific condition. She knew that he allegedly looked like a "Jew in a concentration camp" and that a fellow nurse was very concerned about him, but she did not take any extra steps to examine his condition at any time. Nor did she try to refer Mr. McManus for health care assessment by a physician.

Although Defendant Hulkoff believed that Mr. McManus needed psychological help, she did not try to refer him for psychological treatment at any time. Hulkoff Dep., pp. 139-140; 158. As a registered nurse, Defendant Hulkoff has been trained to recognize basic psychiatric illnesses. *Id.* at p. 140. Nurse Hulkoff never requested any kind of help or health care assistance for Mr. McManus prior to his death. *Id.* at p. 158. Nor did Ms. Hulkoff ever review Mr. McManus' medical records to determine if he had ever been examined by Dr. Frontera, despite her concern for his well-being after overhearing Nurse Chosa's comments. *Id.* at pp. 158-59. She never did more than perform a cursory review of whether Mr. McManus was breathing or crouching by his cell door, so she did not examine whether he needed medical or psychological help.

A review of the evidence reveals that a genuine issue of material fact exists regarding whether Defendant Hulkoff was deliberately indifferent to Mr. McManus. It appears that she had subjective knowledge of his condition based on her admission that she overheard Nurse Chosa's statement regarding Mr. McManus' weight. Therefore, Defendant Hulkoff's motion for summary judgment regarding Mr. McManus' Section 1983 claim will be **DENIED**.

### 3. Dr. Fernando Frontera

Defendant Frontera's motion for summary judgment poses a more difficult question than the motions of the other two Defendants at issue here. The evidence of Dr. Frontera's involvement in Mr. McManus' care is scant. If a medical physician is "not sufficiently involved" with an inmate who suffers harm to support liability, a plaintiff may fail to state a claim of deliberate indifference against that physician. *See Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999) (en banc). With respect to the deliberate indifference standard as it relates to a physician,

the question is not analogous to "a products-liability case, and the standard is not whether there is something easy that the doctors, with the benefit of hindsight, could have done. It is whether they 'kn[ew] of and disregard[ed] an *excessive* risk to inmate health or safety.'" *Williams*, 186 F.3d at 692 (quoting *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970). In determining whether to find deliberate indifference based on inadequate medical care, the Sixth Circuit has noted a distinction between two different claims:

> We distinguish between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment. Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law. Of course, in some cases the medical attention rendered may be so woefully inadequate as to amount to no treatment at all.

*Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). In addition, "[d]eliberate indifference, however, does not include negligence in diagnosing a medical condition." *Sanderfer v. Nichols*, 62 F.3d 151, 154 (6th Cir. 1995).

Further, the Sixth Circuit has held that :

> "deliberate indifference may be established by a showing of grossly inadequate care as well as [by] a decision to take an easier but less efficacious course of treatment." However, . . . Plaintiff must still present evidence of a prison official's subjective awareness of, and disregard for, a prisoner's serious medical needs.

*Perez*, 466 F.3d at 424 (quoting *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002)).

With respect to the liability of a supervisor,

> § 1983 liability of supervisory personnel must be based on more than the right to control employees. Section 1983 liability will not be imposed solely upon the

basis of respondeat superior.  There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it.  At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.

*Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984).  *See also, Copeland v. Machulis*, 57 F.3d

476, 481 (6th Cir. 1995).

There is no evidence that Dr. Frontera was responsible for supervising any of the nursing

Defendants.  Nor is there evidence that Dr. Frontera ever saw or examined Mr. McManus.  There

is evidence that Dr. Frontera noted that Mr. McManus refused to be seen in July, but it is unclear

whether he reviewed Nurse Hornick's referral notice indicating Mr. McManus' weight and that

he was "very thin and ill looking."  The record pertaining to Dr. Frontera's subjective knowledge

of Nurse Hornick's referral notice is vague at best.  Further, it appears that although Dr. Frontera

was responsible for making rounds at some point in September of 2005, he never saw or

examined Mr. McManus.

In *Clark-Murphy* the Sixth Circuit determined that the claims against two of the

defendants should be dismissed because there was not sufficient evidence of their deliberate

indifference.  The court noted, "[i]n contrast to these 11 defendants, Sergeant Becher and nurse

Friedt worked just one 8-hour shift between Clark's seizure on June 29 and his death on July 3 or

July 4.  While a prison employee doubtlessly could exhibit deliberate indifference toward an

inmate in the course of one shift, neither Friedt nor Becher had sufficient exposure to Clark to

make out a triable issue of fact that any such wantonness occurred on their part."  *Clark-Murphy*,

439 F.3d at 290.  Likewise, in this action, there is simply not enough evidence that Dr. Frontera

had any subjective knowledge of Mr. McManus' condition to display deliberate indifference

towards his plight. There are no claims that anyone personally informed Dr. Frontera regarding Mr. McManus' condition, and nothing in the record suggests that he spoke to anyone about Mr. McManus. Further, although Dr. Frontera may have been responsible for conducting rounds on Mr. McManus' unit during September 2005, there is no evidence he observed Mr. McManus at that time. Although Dr. Frontera may have violated MDOC's policy by not completing his rounds thoroughly, such evidence is not enough to establish a genuine issue of material fact regarding his deliberate indifference.

As described in *Clark-Murphy* with respect to two of the defendants, there is not sufficient evidence of Dr. Frontera's exposure to Mr. McManus to create a triable issue of fact regarding his deliberate indifference. Because there is no evidence of Dr. Frontera's clear subjective knowledge of Mr. McManus' condition during the summer of 2005, Dr. Frontera's motion for summary judgment pertaining to Mr. McManus' Section 1983 claim will be **GRANTED**.

### B. Gross Negligence Claim

Under Michigan law "[i]f the claim pertains to an action that occurred within the course of a professional medical relationship and the claim raises questions of medical judgment beyond the realm of common knowledge and experience, the claim sounds in medical malpractice, not ordinary negligence." *Woodard v. Custer*, 719 N.W.2d 842, 865 (Mich. Sup. Ct. 2006) (citing *Bryant v. Oakpointe Villa Nursing Ctr., Inc.*, 684 N.W.2d 864 (Mich. Sup. Ct. 2004)). Michigan courts have defined medical malpractice as "the failure of a member of the medical profession, employed to treat a case professionally, to fulfill the duty to exercise that degree of skill, care and diligence exercised by members of the same profession, practicing in the same or similar locality,

in light of the present state of medical science." *Bryant*, 684 N.W.2d at 872 (quoting *Adkins v. Annapolis Hosp.*, 323 N.W.2d 482 (Mich. Ct. App. 1982)). The first question to ask "in determining whether these claims sound in ordinary negligence or medical malpractice is whether there was a professional relationship between the allegedly negligent party and the injured party." *Bryant*, 684 N.W.2d at 873. The second question is whether "the acts of negligence alleged 'raise issues that are within the common knowledge and experience of the jury or, alternatively, raise questions involving medical judgment.'" *Id.* (quoting *Dorris v. Detroit Osteopathic Hosp. Corp.*, 594 N.W.2d 455, 465 (Mich. Sup. Ct. 1999)).

Further, under Michigan law,

governmental employees acting within the scope of their authority are immune from tort liability except in cases in which their actions constitute gross negligence. Gross negligence is defined by the [Governmental Tort Liability Act] "as 'conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.'" Furthermore, the grossly negligent misconduct must be "*the* proximate cause," of the plaintiff's injuries, that is to say "the one most immediate, efficient, and direct cause . . . ."

*Tarlea v. Crabtree*, 687 N.W.2d 333, 339 (Mich. Ct. App. 2004) (citations and quotations omitted); *see* Mich. Comp. Laws 691.1407(2)(c). Indeed, the standard of gross negligence requires "almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks. It is as though, if an objective observer watched the actor, he could conclude, reasonably, that the actor simply did not care about the safety or welfare of those in his charge." *Tarlea*, 687 N.W.2d at 340. A claim for gross negligence under Michigan law requires that a plaintiff demonstrate the following elements:

(1) Knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury to another.
(2) Ability to avoid the resulting harm by ordinary care and diligence in the use of

the means at hand.
(3) The omission to use such care and diligence to avert the threatened danger
when to the ordinary mind it must be apparent that the result is likely to prove
disastrous to another.

*People v. McCoy*, 566 N.W.2d 667, 669 (Mich. App. 1997). In addition:

A governmental employee is not immune from tort liability for injuries to persons
caused by the employee while in the course of employment if the employee's
actions amount to gross negligence that is the proximate cause of the injury.
"Gross negligence" is defined as "conduct so reckless as to demonstrate a
substantial lack of concern for whether an injury results." Summary disposition is
precluded where reasonable jurors honestly could have reached different
conclusions with respect to whether a defendant's conduct amounted to gross
negligence.

*Stanton v. City of Battle Creek*, 603 N.W.2d 285, 374-75 (Mich. Ct. App. 1999).

It appears evident that Mr. McManus' claim does not fall within the realm of medical

malpractice. The record is clear that it was obvious even to laypersons like fellow inmate Bobby

Fisher and Warden Luoma that Mr. McManus was slowly wasting away. His medical and

psychological issues were obvious to the ordinary observer and required no special training to

observe. Therefore, Mr. McManus' claim falls within the realm of negligence. For the same

reasons analyzed *supra* in Parts III, A, 1-2 with respect to Defendants Johnson and Hulkoff, the

court concludes that a genuine issue of material fact exists regarding whether these Defendants

were grossly negligent with respect to Mr. McManus' condition. Their behavior indicates a lack

of concern for whether Mr. McManus lived or died, and the record demonstrates that they both

had reasons to observe the desperate state of both his physical and mental health. They both had

subjective knowledge of Mr. McManus' situation; they were both in a position to avert the

danger to him by providing him medical aid. Further, it is clear that their failure to act helped

lead to the disastrous result of Mr. McManus' untimely death. *See McCoy*, 566 N.W.2d at 669.

-38-

For these reasons, Hulkoff's and Johnson's motions for summary judgment regarding the gross negligence claims against them will be **DENIED**.

With respect to Dr. Frontera, there is no evidence of his knowledge of Mr. McManus' dire condition, a necessary element of a gross negligence claim. *See McCoy*, 566 N.W.2d at 669. Therefore, Dr. Frontera's motion to dismiss Plaintiff's gross negligence claim will be **GRANTED**. Plaintiff's gross negligence claim against Dr. Frontera will be **DISMISSED**.

### IV. Conclusion

For the reasons described *supra*, Defendant Johnson's motion for summary judgment will be **DENIED**. Defendant Hulkoff's motion for summary judgment will also be **DENIED**. Defendant Frontera's motion will be **GRANTED**.

A separate order will enter.


Date: 7/22/09                                        */s/ R. Allan Edgar*
_____          R. ALLAN EDGAR
                                               UNITED STATES DISTRICT JUDGE